19MAG 8857

ORIGINAL

Approved: _____
BENJAMIN WOODSIDE SCHRIER
Assistant United States Attorney

Before:  THE HONORABLE ONA T. WANG
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :  SEALED COMPLAINT
                                    :
         - v. -                     :  Violation of
                                    :  18 U.S.C. § 371
IAN CARMICHAEL,                     :
                                    :  COUNTY OF OFFENSE:
              Defendant.            :  MANHATTAN
                                    :
                                    :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    EDWARD J. MARTIN, being duly sworn, deposes and says that he is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and charges as follows:

## COUNT ONE
### (Firearms Trafficking Conspiracy)

    1.  From at least on or about May 16, 2019, up to and including at least on or about September 19, 2019, in the Southern District of New York and elsewhere, IAN CARMICHAEL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, firearms trafficking, in violation of Title 18, United States Code, Section 922(a)(1)(A).

    2.  It was part and object of the conspiracy that IAN CARMICHAEL, the defendant, and others known and unknown, not being licensed importers, licensed manufacturers, and licensed dealers of firearms within the meaning of Chapter 44, Title 18, United State Code, would and did willfully and knowingly engage in the business of dealing in firearms, and in the course of such business would and did ship, transport, and receive

firearms in interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(a)(1)(A).

**Overt Acts**

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a. On or about September 18, 2019 and September 19, 2019, IAN CARMICHAEL, the defendant, traveled from in or around Orlando, Florida to Manhattan, New York for the purpose of illegally selling one or more firearms.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Special Agent with the ATF and I have been personally involved in the investigation of this matter. I have been an ATF Special Agent for over approximately four years. During that time, I have participated in over approximately 20 investigations into firearms trafficking. This affidavit is based on that experience, my conversations with other law enforcement officers and others, and my examination of reports, records, photographs, and video and audio recordings. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. Based on my involvement in this investigation and my conversations with other law enforcement officers who were directly involved in the events described below, including other ATF agents and New York City Police Department ("NYPD") detectives, as well as my review of reports, records, photographs, and audio recordings, including transcripts from a wire tap of a telephone used by IAN CARMICHAEL, the defendant, which was authorized by a Justice of the New York State Supreme Court, I have learned, among other things, the following:

a.  Since in or about June 2018, the NYPD has been conducting an investigation into potential criminal activity in New York City that does not directly relate to IAN CARMICHAEL, the defendant. In the context of that investigation, however, the NYPD became aware of certain discussions between CARMICHAEL and others during which CARMICHAEL appeared to discuss the illegal sale of firearms.

b.  On or about May 10, 2019, on the basis of those discussions and other evidence, a Justice of the New York State Supreme Court issued an order authorizing a wire tap (the "Wire Tap") on a cellphone (the "Cellphone") known to be used by IAN CARMICHAEL, the defendant. The NYPD began using the Wire Tap on the Cellphone the same day that the order was issued. The NYPD subsequently obtained reauthorization for the continued use of the Wire Tap several times, such that the use of the Wire Tap remains authorized through the date of this Complaint.

c.  Throughout the course of the Wire Tap's existence, the NYPD and the ATF have reviewed the transcripts of various calls that IAN CARMICHAEL, the defendant, has placed or received. During certain of those calls, CARMICHAEL appears to have discussed the illegal sale of firearms.

d.  For example, on or about May 16, 2019, IAN CARMICHAEL, the defendant, called an unknown male ("CC-1"), and the following conversation took place, in sum and substance:

CARMICHAEL: What up? Your man lined up for me?

CC-1: I don't know where the fuck he is. He might be locked up, there was a big shoot out.

. . . .

CARMICHAEL: What the fuck man? I'm, I got three four three four five. Five and one long.

e.  On or about May 17, 2019, CC-1 called CARMICHAEL, and the following conversation took place, in sum and substance:

CARMICHAEL: So um, I pick some up.

CC-1: I mean I'm, huh?

CARMICHAEL: I got, maybe I can come up there for this 2K.

CC-1: 2K?

CARMICHAEL: Got somebody, that's all I could, that's all I have three sold.

CC-1: So I mean, I'm not gonna...

CARMICHAEL: But I'm looking to make more than that.

CC-1: I might have an idea where he's at, I'll take a walk right now.

CARMICHAEL: Yeah, but if that motherfucker got legal issues, why would I fucking want to fuck with him.

. . . .

CARMICHAEL: Just for old time's sake, because I kept on waiting, I kept on waiting seven months, man. By that time we already had, probably cheaper too, the kid around the way, around the old way, I could presell two thousand for that kid, that ain't worth it, I don't want to come up there with extra shit if I can get rid of it.

       f. On or about May 17, 2019, CC-1 called CARMICHAEL, and the following conversation took place, in sum and substance:

CARMICHAEL: Yo, you call me?

CC-1: Yeah he said, he said, he said tell him to come down.

CARMICHAEL: And he'll take everything?

CC-1: Yeah.

CARMICHAEL: Alright, uh, let me get my shit together, I gotta pick up three more.

CC-1: Alright.

CARMICHAEL: Yeah, um.

CC-1: Listen, uhh, you got any 9?

CARMICHAEL: Yes, yeah.

CC-1: Alright, 'cause I got one guy who wants one, he's a young cat, he's a good friend of mine, he works for, uh...

CARMICHAEL: Eight.

CC-1: You got eight of them?

CARMICHAEL: No, eight per.

CC-1: Alright, I'll talk to him, I'll talk to him.

CARMICHAEL: Everything I got is stacked, plus one long thing.

. . . .

CARMICHAEL: I'll give you the inventory before I leave.

        g.  On or about July 28, 2019, a person other than CC-1 ("CC-2") sent a text message to IAN CARMICHAEL, the defendant, in which he wrote, in sum and substance, "Yo u still got the .40 I need it back I'll give you your money back that shit is still on my name."  On or about the same day, CARMICHAEL responded to CC-2 by texting, in sum and substance, "That was 1 I kept.  I'll take the cash back thought [sic]."

        h.  On or about August 24, 2019, IAN CARMICHAEL, the defendant, called an unknown male other than CC-1 or CC-2 ("CC-3"), and the following conversation took place, in sum and substance:

. . . .

CARMICHAEL: Now, uh, my thing.  I ain't got no more than what I showed you.  It's six.  The long one, and the small ones.

CC-3: That's fine.  Whatever works for you to come down.

CARMICHAEL: That's what I'm saying though, 'cause I was thinking because the best I can do is five on that shit.  But the thing is I can't take my car on that long of a distance.  And the long one I, I really don't want to travel with, publicly, publicly you know.

CC-3: I, definitely worth to come down man.

CARMICHAEL: The what?

CC-3: I said, it'll be worth it to come here.

CARMICHAEL: Yo.  If, if, if it, they presold, I definitely got, I got to come anyway though, I'm fucking broke man.  And I ain't, I, I'm working maybe one or two days a week.

. . . .

CARMICHAEL: And that's two, stacks.

CC-3: Two G's.

CARMICHAEL: Yeah. For the long one.

. . . .

BUYER: Yo, give me the, give me the big, the big for two. Send me that.

    i.    Based on my training and experience, I believe that, during the phone conversations and exchange of text messages described above, the participants were discussing the potential illegal sale of firearms. For instance, during the May 16, 2019 phone call, one of the participants referred to "one long," which is a term that is sometimes used by firearms traffickers and purchasers to refer to a "long gun," i.e., a rifle or shotgun. Additionally, during the first May 17, 2019 phone conversation, one of the participants referred to "2K," which is a term that is sometimes used by firearms traffickers to refer to $2,000, within the range of the approximate street value of a long gun. During the second May 17, 2019 phone conversation, one of the participants referred to a "9," which is a term that is sometimes used by firearms traffickers to refer to a 9mm handgun. During that same conversation, the participants referred to "8," and "8 per." $800 is within the range of the approximate street value of a 9mm handgun. During the July 28, 2019 exchange of text messages, one of the participants referred to a ".40," which is a term that is sometimes used by firearms traffickers to refer to a .40 caliber firearm. During the August 24, 2019 phone call, the participants referred to "two G's" and "two stacks," which are terms that are sometimes used by firearms traffickers to refer to $2,000. During that same phone call, the participants also referred to a "long one," in connection with the apparent reference to $2,000. Like "one long," "long one" is a term that is sometimes used by firearms traffickers to refer to a long gun. As noted previously, $2,000 is within the range of the approximate street value of a long gun.

    j.    On or about September 18, 2019, IAN CARMICHAEL, the defendant, participated in a phone call on the Wire Tap during which he arranged a ride to a bus station in or around Orlando, Florida, where CARMICHAEL has been living since at least in or about May 2019. Based on a review of records provided by one of the bus companies that uses the station (the "Bus Company"), it was determined that CARMICHAEL had purchased a ticket to take one of the Bus Company's busses (the "Bus") from Orlando to Manhattan, New York, leaving Orlando at or around 3:00 p.m. on September 18, 2019, and arriving in Manhattan at or around 11:00 a.m. on September 19, 2019.

k.  Law enforcement officers subsequently identified the Bus, and followed it from a location on the New Jersey Turnpike to at or around 95 Canal Street in Manhattan, where it stopped at or around 12:00 p.m. on or about September 19, 2019. Shortly thereafter, a person matching the photograph and physical description of IAN CARMICHAEL, the defendant, contained in a database maintained by the Florida Department of Motor Vehicles, exited the Bus and began walking away from it carrying a blue backpack (the "Backpack") and a black rolling suitcase with yellow trim (the "Suitcase").

l.  At or around that time, ATF agents effected a probable cause arrest of IAN CARMICHAEL, the defendant. When approached by one of the ATF agents, CARMICHAEL said, in sum and substance, "Oh shit," and identified himself as CARMICHAEL. An ATF agent asked CARMICHAEL what was in the Suitcase, and he responded, in sum and substance, "I don't know, search it." Later, an ATF agent asked CARMICHAEL for his consent to search the Suitcase. CARMICHAEL responded, in sum and substance, that he was not sure whether he should give the ATF agent consent, because if there was something in the Suitcase that he was not supposed to have, he could get "jammed up." CARMICHAEL ultimately declined to give his consent to search the Suitcase.

m.  Following CARMICHAEL's arrest, the Backpack and the Suitcase were transported to an ATF office located in the Bronx, New York. There, an ATF canine that has been specially trained to detect gunpowder and gunpowder residue was brought into the room where the Backpack and the Suitcase were located. The canine "alerted" to both the Backpack and the Suitcase, meaning that the canine indicated to its ATF agent handler that the Backpack and the Suitcase contained gunpowder or gunpowder residue.

6.  Based on my review of searches of an ATF database, and my conversations with other law enforcement officers, I have learned that, from at least on or about May 16, 2019, up to and including at least on or about September 19, 2019, IAN CARMICHAEL, the defendant, was not a licensed firearms dealer, importer, or manufacturer.

WHEREFORE, deponent respectfully requests that IAN CARMICHAEL, the defendant, be imprisoned or bailed, as the case may be.

_____
EDWARD J. MARTIN
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to before me this
19th day of September 2019

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK